THE MANASQUAN GRAVEL COMPANY, DEFENDANT IN ERROR, v. P. SANDFORD ROSS, INCORPORATED, PLAINTIFF IN ERROR.

Argued February 27, 1906—Decided June 11, 1906.

A suit upon a warranty by the defendant that a certain steam shovel owned by it would do the work required by the plaintiff cannot be sustained where the evidence of the contract of warranty is derived from conversations between the respective representatives of the plaintiff and defendant concerning the shovel then in the plaintiff's gravel pits, the plaintiff complaining that the shovel upon trial would not do the work required of it, and the defendant assuring the plaintiff that it would when put in proper condition, it further appearing that the shovel had been delivered to the plaintiff's gravel pits under an option to buy for which there was a consideration, and that the plaintiff, at the time it alleges the making of the contract of warranty, had not exercised its option, and no consideration is shown for the contract of warranty.

---

On error to the Monmouth County Circuit Court.

Before Justices GARRISON, GARRETSON and SWAYZE.

For the defendant in error, *Edmund Wilson.*

For the plaintiff in error, *Bedle, Edwards & Thompson.*

The opinion of the court was delivered by

GARRETSON, J.  The plaintiff, the gravel company, owned certain gravel pits, and the defendant, the Ross company, owned a steam shovel, out of repair; the defendant agreed to repair the shovel and transport it to the plaintiff's gravel pits, the plaintiff to have the right to use it for thirty days, with an option of buying it at any time during the thirty days for $2,000.  If the plaintiff did not buy it, it was to pay the cost of repairs, the cost of transportation, $10 a day for the use of the shovel and return it in as good condition as it was sent.  The agreement was made May 25th, 1902, and was in writing.  The shovel was repaired and reached the plaintiff's pits June 16th.  It was put to work, but did not work to the satisfaction of the plaintiff, and on the 30th of July the defendant was told to take the machine out.

The Ross company, alleging that the gravel company had failed to keep the above contract with it, brought suit, and recovered as damages for the breach the cost of repairs on the shovel, the cost of transportation, and, for the use of the shovel, at $10 a day, a judgment for $2,680.57.

The above suit by the Ross company against the gravel company was begun November 8th, 1902; the cause was tried May 7th, 1903, and judgment entered at the June Term, 1903, of the Supreme Court.

The present suit was begun October 16th, 1902, nearly a month before the last-mentioned suit, and was brought to trial April 21st, 1905.

The declaration sets forth an agreement, on the 1st of July, 1902, whereby the defendant agreed with the plaintiff that it, the defendant, would, in consideration of the plaintiff agreeing to accept on trial a steam shovel of the defendant and to purchase the same of the defendant at a stipulated price in case the steam shovel should prove satisfactory, repair the steam shovel prior to its delivery to the plaintiff and would place upon it necessary and sufficient repairs to enable it, after making the repairs and upon its delivery, to well and sufficiently operate and work the gravel pits of the plaintiff, and load with gravel cars of the plaintiff used by it in

conducting its business; that the steam shovel was delivered; the plaintiff used it, but it did not and would not operate nor work the gravel pits nor load the cars, and damages resulted.

This is clearly a suit for a breach of the defendant's alleged warranty that the shovel would operate and work the pits and load the cars.

The plaintiff proved, by the testimony of its president, that he agreed with the president of the defendant that the plaintiff should take it on trial, with the right to use it for thirty days, with the option of buying it at any time during the thirty days for $2,000; that if the plaintiff didn't buy it, it was to pay the cost of repairing, pay the transportation charges and return it in as good condition as it was sent, and pay $10 a day for the use of the shovel.

Thereby the plaintiff obtained from the defendant an option to buy the shovel for $2,000, and agreed to pay for that option the cost of repairs and transportation, and $10 a day while it had it, and the plaintiff, having determined not to exercise the option, returned the shovel, but refused to pay the cost of repairs, transportation and per diem charge, so the defendant sued the plaintiff for these amounts and recovered the judgment above mentioned.

The plaintiff in this action claims that there is a contract of warranty between it and the defendant entered into with respect to this shovel. The shovel having been delivered at the pits on the 16th of June, but was not in condition to be put to work; efforts were made by workmen of the defendant to get it to work, and on the 23d of June the plaintiff's president had a conversation with the defendant's president, which he details as follows:

"*Q.* You are going to describe, now, a conversation you had with him on the night of the 23d?

"*A.* Yes, sir; I called Mr. Ross up on the phone and I told him what I had observed; I told him that the shovel was there and that it would not work, and that his men wouldn't tell me when it would work; that I had tried to find out and I couldn't find out; I told him about the loco-

motive being there; told him about the expense we were being put to, and I reminded him about the fact that the shovel was not in the condition he told me; I told him that we had agreed to pay the repairs and transportation charges, that we had agreed to pay so much for the shovel while it was in the pits, but that was a bargain I was tired of, and didn't want anything more to do with it; that our teams were still in our employ and we were going back to the old system; I told him of the contracts that we had to get out, and had to get them out at once or cancel them; I told him we wanted nothing more to do with it—to take the shovel out; he told me that I was alarmed; it would be a great big mistake to take the shovel out; he knew the shovel was right; he knew it was repaired and it would do the work; he was sure of it, and I could depend on it; I then told him he was asking me to take his word absolutely for it, and I knew nothing about it, and it was ruining our business and we were losing a large amount of money, and that our business was limited to a certain few weeks of the year; he says, 'You get it in there and you will find it will do just as I tell you; you will have no more delays or breakages with it than are incident to the usual operation of an ordinary steam shovel;' I told him I would try it; we kept it in and the next day was a duplicate of the first day; the engine lay there and the shovel didn't move, as I recall it, a dipper full of gravel.

"*Q.* Directing your attention to this conversation of the night of the 23d, after having recounted the history of the transaction, you told him, as I understand your statement, having detailed what you alleged to be his defaults, you told him you wanted him to take the shovel out, didn't you?

"*A.* I don't say, Mr. Wilson, that I told him to take the shovel out; I told him that I didn't want it; that he was in default; that he was ruining our business; I didn't want it; and I gave him reasons for it; that he was charging us $10 a day; he was ruining our business, and I didn't want it, and wanted to stop right where we were.

"*Q.* You told him that?

"*A.* Yes, sir; and go back to the old system.

"*Q*. After he had made his reply that you already referred to, you say you retained the shovel?

"*A*. Yes, sir.

"*Q*. And what happened after that?

"*A*. The second day was practically what happened the day of the 23d; it didn't move any gravel; the men were working on it trying to repair it, and the engine stood there; I again called Mr. Ross up, I think, that night; I can't be absolutely certain about the night, but I don't think I let him alone a single night from the 9th of June until the 1st of July; I don't think I did; I was talking with him constantly in the evening over the phone, and I again told him our trouble, and every time he told me that I was alarmed; that the machine was all right; that he knew it; that it was no experiment with him; he told me it would load forty cars a day, and he knew it would, and he told me to keep it and not get the teams back; it went along, and the locomotive remained there, I think, three days and a half, without doing anything, because there was no gravel loaded; we couldn't get any gravel out under our old system then, because the steam shovel was in on the track and blocked the way, and we couldn't move any cars by it; we had taken down our bridges, too; finally, after the engine had been there, the locomotive, three or four days, the steam shovel did begin to work, and it loaded a few cars, but we kept our teams, and I think that we only loaded for maybe a week or ten days eight to ten cars, on an average, and we had four or five teams there aiding as much as they could in loading; and I kept talking with Mr. Ross, and he said the machine was getting better; he said his men had been reporting to him, and that I must not be discouraged; that the thing had to be lubricated; that it was not a brand new machine, and it would keep working smoother and smoother, and it would give better results all along.

"*Q*. Did he ever tell you afterwards how old the machine was?

"*A*. I heard him testify in Jersey City how old it was.

"*Q*. How old was it?

"*A*. Sixteen years; and it lay idle eleven years.

"*Q.* Well, now, go on?

"*A.* Well, it kept going on and I kept complaining to him about the delay, the fact of our not getting out the gravel; but we allowed our teams to go; we had completely discontinued our old system of loading cars, and I couldn't go back to it, and it was either to go on with him or not at all, and we were under contracts with different municipalities, and we went along; finally, the machine, instead of getting better, kept getting worse, and I reported to Mr. Ross this fact, and I told him that some of the men who were employed upon it refused to work on it; said it was dangerous; and he laughed at that and said it was all nonsense; that the machine was all right and safe, and was efficient; and finally I told him I wanted him to come down there and look at it; that evidently he didn't know much about the machine; 'I don't say that you have absolutely misrepresented to me, but if you haven't, you don't know what you are talking about; I want you to come and look at it;' he came down and looked at it, and finally, I think on the 30th of July or the last of July, I told him to take the machine out.

"*Q.* Did he take it out?

"*A.* He took it out; yes, sir; it was taken out; it broke down in going out; it was taken out.

"*Q.* Did you pay him for the use of this machine, the transportation and repair, and so forth?

"*A.* Yes, sir; we paid him nearly $3,000 for it; $1,100 for repairs on it.

"*Q.* And he took it out on the 30th day of July, or you told him on the 30th to take it out?

"*A.* Yes, sir; about that time.

"*Q.* How soon afterwards did he take it out?

"*A.* Well, within a few days; I can't say positively."

Out of this conversation and testimony the plaintiff seeks to derive the contract of warranty upon which the suit is brought.

This must be a contract separate from the option which was obtained and for which the plaintiff, by his testimony just cited, paid.

It could not be a new term added to the original contract, for the original contract was only the giving of an option to buy a machine which on trial should prove satisfactory. No change of ownership under such a contract took place until the purchaser expressed his satisfaction.

Nor can we find in the case any evidence to show a consideration for the contract or warranty. Everything that the defendant was to get and all it did get was only the consideration for the option agreed upon beforehand.

The plaintiff has failed to sustain the contract sued on, and the judgment below must be reversed.